IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHELLEY A PONCE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-06931 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W COLVIN, Acting | ) | The Honorable Arlander Keys |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Plaintiff Shelley Ponce's motion for summary judgment. She seeks a remand or an outright reversal of the Commissioner's decision to deny her application for Disability Insurance Benefits and Supplemental Security Income before September 17, 2009. For the reasons set forth below, Ms. Ponce's motion is denied and the Commissioner's motion for summary judgment is granted.

**BACKGROUND & PROCEDURAL HISTORY**

On December 7, 2006, Plaintiff Shelly Ponce applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (R. 107.) Ms. Ponce alleged that she became disabled as of August 1, 2000, due to a series of health issues including severe back pain, bladder problems, bursting appendix, high blood pressure, cholesterol, limited use of her hands, and pain and numbness on the right side of her body. (R. 148, 311.)

Ms. Ponce's application was denied initially on July 27, 2007, and upon reconsideration on August 24, 2007. (R. 107.) Ms. Ponce requested a hearing before an Administrative Law Judge ("ALJ"), and the case was assigned to ALJ Arthur Cahn, who held the requested hearing on September 2, 2009. *Id*. The ALJ partially granted Ms. Ponce's disability request, holding that Ms. Ponce was disabled as of October 27, 2007, but not before. (R. 116.) Ms. Ponce disagreed with the onset date and requested the Appeals Council's review of the ALJ's decision. (R. 38.)

On December 10, 2010, the Appeals Council vacated the decision and remanded the case for further review. *Id*. On review, the Appeals Council directed the ALJ to: (1) further evaluate the claimant's subjective complaints and provide a rationale; (2) give further consideration to the claimant's maximum residual functional capacity and provide an appropriate rationale for it with specific record references; and (3) obtain evidence from a vocational expert about whether the claimant had any transferable skills from her past relevant work while determining whether the vocational expert's occupational evidence was in conflict with the Dictionary of Occupational Titles. *Id*. The case was then assigned to ALJ Patrick Nagle, and a second hearing took place on October 27, 2011. *Id*. On November 14, 2011, ALJ Nagle determined that Ms. Ponce was disabled as of September 17, 2009, but not prior. The

significance of this finding is that Ms. Ponce was last insured for disability insurance benefits on September 30, 2005, though she qualifies for supplemental insurance benefits as of the later date. (R. 49-50.) Again, Ms. Ponce requested the Appeals Council to review the ALJ's decision, but it was denied on May 25, 2012. (R. 5, 32.)

**ALJ HEARING**

At the hearing before ALJ Nagle, Ms. Ponce appeared, and was represented by counsel. (R. 70.) Ms. Ponce testified that she was born on September 18, 1954, and lives with her two sons, daughter in law, two grandchildren and husband. (R. 81-82, 273-74.)

With regard to Ms. Ponce's work history, Ms. Ponce testified to the following: She worked in a warehouse as a line supervisor at Midwestco Enterprises for thirty years. (R. 82, 304.) She would measure, perform quality control inspections, and check transformers on the trucks. (R. 83). The work would vary between standing and sitting. *Id.* She would also lift between ten to seventy-five pounds on a regular basis, and if she "pulled a truck it could go up to about four hundred to five hundred pounds." *Id.* Ms. Ponce testified that she stopped working there because her body was breaking down. *Id.* She further stated that the pain started in her arms, and she felt

splinters in her feet, which lead to her having surgery on her right foot. *Id*.

Ms. Ponce testified to the following: Beginning in 2008, she had a number of surgeries. (R. 75.) In February of 2008, she had a cervical back fusion. *Id*. Then in 2010, she had another surgery on her C6 and C7 vertebrae and a subsequent surgery in September of 2011 on her C3, C4 vertebrae all the way down to C1 to C2. (R. 76.)

She testified that, since 2000, she was progressively losing control of her hand, and if she held something, she would not be aware if she lost it. *Id*. She also testified that because of her legs, she would lose her balance, or she would feel like a thousand needles were going up her right side and that these symptoms progressed with time. *Id*. She would lose things often and could not control a toothbrush or comb her hair. *Id*. Due to the pressure in her leg, she was not able to pick herself up if she bent down to pick up anything. *Id*. Ms. Ponce testified that, during the eight years prior to her surgery, the physicians she sought treatment from continuously stated that she had perhaps pulled a muscle, but they could not pinpoint the exact problem. (R. 77.) She testified that the physicians decided to perform surgery because she fell multiple times, her feet would tingle, she experienced sharp pains oscillating on her right side, the back of her neck was starting

to hurt immensely, and she was not able to get out of bed. *Id.* At the time she took pain medication, however, the physicians insisted that she not continue doing so, in order for them to pinpoint the cause of her symptoms. *Id.* Ms. Ponce also testified that she had carpal tunnel, but did not have surgery. *Id.* She testified that after her back surgery in 2010, her hands worsened and that, after the subsequent surgery in 2011, she was not able to move her right hand or raise her right arm. (R. 77-78, 88.) She testified that approximately two years lapsed between her first and second surgery, but the pain did not subside. (R. 78-79.) She described feeling as though a thousand needles were punching her in the arm all the way down to her feet and in one instance, prior to her second surgery, her arm froze in place, for which she sought immediate treatment at an emergency facility. *Id.*

Ms. Ponce then testified to the tasks she was able to perform in 2000, that she was no longer able to perform in 2005. (R. 79.) During this time, she developed difficulty, and eventually an inability, to fold a towel or brush her hair. (R. 79, 84.) She would mistake planting her leg down because she had no control of it. *Id.* Her symptoms worsened from 2005-2010. (R. 79-80.) She testified that the pain got sharper, and it started to move to the left side, and her left palm and the outside of her fingers would get cold and numb. (R. 80.) These

symptoms began after her second surgery. *Id*. She testified that, before her second surgery, she could walk a distance of three to four houses before feeling pain, but after the surgery the pain worsened and she could only go across from the living room to the back. *Id*. With regard to daily life, she testified that she does not cook and has not done so since 2000. (R. 80-81.) She does not do any housework. *Id*. In October of 2011, she only left the house once, and that was to attend the ALJ hearing, however, in 2006 or 2007, she would leave the house twice a week to get fresh air. (R. 81.) She would take rides with her husband to pick up groceries, but would not get out of the car because of the pain in her legs. *Id*. Furthermore, she did not attend any of her son's or grandchildren's school activities. *Id*.

Ms. Ponce testified that in 2002, she started seeing Dr. Cohen because she had pain "from her buttocks to the back of her shoulder." (R. 83.) She experienced shooting pain in her right arm, and it intensified as time went on. (R. 84.) In September of 2005, and prior, she experienced sharp pain in her leg; her leg would not settle down, it continuously flinched. *Id*. During this time, she had difficulty pushing buttons. *Id*. She experienced difficulty tying her shoes, so her family purchased her slip-on shoes. *Id*. Prior to 2005, she used a walker because her right leg would fold up without notice, causing her

to fall to her knees.  (R. 85.)  Her right leg felt weak, and she was unable to tell if it was facing forward or backwards, often times resulting in her falling.  *Id*.

She testified that she stopped driving in 2000, because of leg cramps and her inability to get in and out of the car due to her legs falling asleep.  (R. 85-86.)  When she climbed stairs, she had pain in her buttocks, and if she sat too long she felt pressure around her neck.  (R. 86.)  During this time, she would get aggravated, feel depressed, and start crying.  *Id*. She would take aspirin and stay at home five or six hours.  *Id*. She was not able to kneel down because she was not able to get back up.  *Id*.  In 2004, she was unable to lift much with her right hand because it would shake; she was not able to pour a cup of coffee or a gallon of milk.  (R. 87.)  She experienced difficulty eating because the oscillation was tiring and it caused her arm to tighten.  *Id*.  She testified that she was also unable to cut meat or use a fork with her right hand, and that it was easier to use a spoon because it would hurt her arm to poke.  (R. 88.)  She also testified that her fingers would swell periodically. *Id*.  She was taking four or five medications for pain, such as Lipitor, and some muscle relaxants. *Id*.  She had formerly taken Prozac for depression, but had switched to Wellbutrin.  *Id*.

**VOCATIONAL EXPERT TESTIMONY**

The ALJ also heard testimony from Terry Seaver, a Vocational Expert, who had reviewed Ms. Ponce's prior work and vocational background. (R. 90.) Ms. Seaver was present during Ms. Ponce's testimony. *Id*. She testified that Ms. Ponce's prior employment consisted of working as a quality control supervisor, a job with medium physical demand. *Id*. She testified that there were no transferrable skills from that job to a light range position. *Id*. Ms. Seaver determined that a hypothetical individual who is closely approaching advanced age with a limited 11th grade education, who shares claimant's past work experience and is limited to light work, and in addition is limited to only occasional fingering or feeling with the right hand, would only be able to perform occupations which required "less than frequent or far acuity in the local and national economy." (R. 91.) Ms. Seaver determined that the hypothetical person could perform the following jobs: information clerk, DOT 237.367-018, which had four thousand eight hundred jobs in the local economy; usher, DOT 344.677-014, which had one thousand jobs in the local economy; hostess, DOT 352.667-010, which had seven thousand two hundred jobs in the local economy. *Id*.

However, Ms. Seaver concluded that sedentary work would be precluded, even for a hypothetical individual that was younger in age and not approaching advanced age, because sedentary work

8

would require at least more than occasional fingering with the bilateral extremities. (R. 92.) Ms. Seaver determined that a hypothetical person who could only occasionally rotate, flex, or extend their neck, would be precluded from work. (R. 93.)

**MEDICAL RECORD**

In addition to the testimony of Ms. Ponce and the Vocational Expert, the record before the ALJ includes medical records. However, as pointed out during the ALJ hearing, the record does not include the medical records of Ms. Ponce that document her symptoms or ailments between August 2000 to June 2002, because she did not submit them to the Social Security Administration or the ALJ. (R. 75.)

*PRE-DATE LAST INSURED DATE - Prior to September 30, 2005*

On June 10, 2002, Ms. Ponce went to Dr. James Cohen due to pain into her right lower leg, and because her back would occasionally feel like it was going to give out. (R. 362.) Dr. Cohen noted that Ms. Ponce has a history of low back pain, as she had pain down her right posterior thigh for twenty years. *Id*. On examination, Dr. Cohen noted that Ms. Ponce had good lumbar range of motion without significant reproduction of her symptoms, and good range of motion of her hips and knees. *Id*. He also noted that Ms. Ponce's knee and ankle reflexes were brisk, EHL testing was normal, sensory exam was normal, pulses were intact and there was no area of tenderness in her lower

legs. *Id*. Dr. Cohen had the impression that Ms. Ponce had some sciatic-type symptoms, however, he did not obtain x-rays. *Id*. He prescribed Ms. Ponce a Medrol Dosepak and ibuprofen and advised her to return if her symptoms did not improve. *Id*. On July 15, 2002, Ms. Ponce went back to Dr. Cohen and complained that the prescribed Medrol Dosepak and ibuprofen did not ease her pain. (R. 361.) Dr. Cohen obtained an x-ray of her LS spine, which was normal except for facet arthritis. *Id*. Dr. Cohen then ordered an MRI. *Id*.

On August 3, 2002, Ms. Ponce had the MRI done in the neurology clinic at ACHN/Fantus Health Center by neurologist Dr. Richard T. Brannegan. (R. 386.) Dr. Brannegan noted that the exam was unrevealing, that Ms. Ponce tended to give away at strength testing and that there was no atrophy. (R. 387.) The physician further noted that he was unsure if there was a neurologic disease present, and noted that he would get a CT scan of the brain. (R. 386-387.)

On October 23, 2002, Ms. Ponce went to the Chicago Department of Public Health for a checkup. (R. 368.) Internal medicine physician, Dr. E. Potash, treated her. (R. 367.) Dr. Potash noted that Ms. Ponce had numbness and tingling on her right side for four to five years, and she experienced right-sided weakness. *Id*. Dr. Potash prescribed Ms. Ponce Naprosyn and scheduled a follow-up appointment for January 15, 2003. *Id*.

On January 15, 2003, Ms. Ponce returned to Dr. Potash. (R. 365.) She again was experiencing numbness on the right side of her body. *Id*. Dr. Potash measured her calf muscles, and the left calf measured at fourteen and three quarter inches and her right measured at fourteen and one quarter inches, a difference of a half inch. *Id*. Dr. Potash also noted that Ms. Ponce limped when walking, and she told him that "she's always done this." *Id*. Dr. Potash noted possible multiple sclerosis or neurological disease and referred Ms. Ponce to a neurologist. *Id*. On July 18, 2003, Ms. Ponce was again seen at the Chicago Department of Public Health. (R. 369.) She complained that she had pain in her right and left arms, and that she was not able to hold objects or fold towels. *Id*. Ms. Ponce indicated that the Naprosyn helped her headaches, but it did not help with her arm and leg pain. *Id*. She was then referred to Neurology of Cook County. *Id*.

On August 8, 2003, Ms. Ponce was again seen in the neurology clinic at ACHN/Fantus Healthy Center by neurologist Dr. Brannegan. (R. 385.) Ms. Ponce continued to complain of right arm and leg pain, as well as weakness. *Id*. She also continued to express that she felt like needles were poking her in the arms and legs. *Id.* Dr. Brannegan noted that Ms. Ponce had trouble with differentiating between sharp vs. dull pain, vibration sense, and position sense on her right arm and leg.

*Id*. Dr. Brannegan also indicated that Ms. Ponce's right side was weaker than her left side when testing for resistance. (R. 372, 385.) She had a CT scan of the brain, which showed no contrast and Dr. Brannegan diagnosed Ms. Ponce with chronic hemiparesis. (R. 372)

On October 27, 2003, Ms. Ponce had a CT scan performed by radiologist Dr. Susan Gilkey, due to the hemiparesis diagnosis. (R. 384.) Dr. Gilkey noted that the CT scan revealed no hemorrhage, no mass, edema or midline shift, no hydrocephalus, no definite infarct identified, and, as a result, Dr. Gilkey was under the impression that the CT scan was normal. *Id*. On November 7, 2003, Dr. Brannegan at the ACHN/Fantus Healthy Center again saw Ms. Ponce in the neurology clinic. (R. 383.) Ms. Ponce complained that she was experiencing the same right side pain and weakness that she had during her previous visits. *Id*. On January 26, 2004, Ms. Ponce had an Electromyogram "EMG" test performed by Dr. Brannegan. *Id*. He noted that the test showed no fibrillations or positive sharp waves in muscle sample and that it was a normal EMG/MCV of the right upper and lower extremities. *Id*.

On June 29, 2004, Ms. Ponce was again seen by Dr. Brannegan for right arm and leg pain. (R. 380.) Dr. Brannegan noted that there was no clear evidence of neurologic disease and that the previous CT scan and EMG tests were all normal. *Id*. Dr.

Brannegan noted that Ms. Ponce's main complaint was excessive fatigue, and that he would refer her to general medicine. *Id*. On October 5, 2004, Ms. Ponce complained of a chronic cough and had a chest x-ray performed. (R. 378-79.) The x-ray revealed that Ms. Ponce did not have pneumonia. *Id*. Radiologist, Dr. Pamela Sobti, was under the impression that Ms. Ponce may have had bronchitis. *Id*. On November 2, 2004, Ms. Ponce had a follow-up visit with Dr. Brannegan. (R. 377.) Dr. Brannegan noted no change, but that he would order a brain MRI to be performed in six months. *Id*. On April 15, 2005, Ms. Ponce had a brain MRI, which was read by radiologist, Dr. Osbert Egiebor. *Id*. The MRI showed that there was mild diffuse cerebral and cerebellar atrophy. *Id.* There was also bilateral, frontal, parietal, occipital and temporal cerebral white matter, and moderate left nasal septum deviation. *Id*. However, there was no intracranial hemorrhage or abnormal extra-axial fluid collection, and the ventricular system and basal cisterns were unremarkable. *Id*. On July 22, 2005, Ms. Ponce had a follow-up with Dr. Brannegan. (R. 373.) Dr. Brannegan noted that Ms. Ponce was continuing to suffer from the same symptoms, and that her symptoms were probably not caused by a stroke. *Id*. Dr. Brannegan advised Ms. Ponce to quit smoking. *Id*.

*POST-DATE LAST INSURED - After September 30, 2005*

On October 5, 2006, Ms. Ponce had a mammography screening examination, which showed dense breast parenchyma, with mild asymmetry. (R. 441.) There was an area of concern that showed a small obscured module. *Id.* Ms. Ponce was scheduled for a follow-up appointment and returned on October 18, 2006. (R. 442.) On October 18, 2006, Ms. Ponce returned and had ultrasounds performed. *Id.* It was noted that the module had benign mammographic and sonographic features. *Id.*

On April 10, 2007, Ms. Ponce complained to internal medicine physician, Dr. Erenee Sirinian, D.O. about extreme back and right side pain. (R. 417-18.) Dr. Sirinian ordered an MRI. *Id.* Ms. Ponce had an MRI of her lumbosacral spine performed by radiologist Dr. Jasna Svarc. *Id.* The results of the MRI showed that there was mottled bone marrow with signal intensity that suggested subtle patchy osteoporotic change. *Id.* The conus medullaris was seen at L1, L5, and S1 revealing left central disc protrusion with annual disruption encroaching the left SI nerve root. *Id.* Radiologist, Dr. Tae Woo Kim noted that Ms. Ponce suffered from mild lumbosacral spondylosis, subtle patchy osteoporotic bones, and left central disc protrusion at L5-S1, resulting in mild lateral recess stenosis. *Id.* On April 23, 2007, on a subsequent follow-up with Dr. Sirinian, Ms. Ponce continued to complain of back pain. (R. 414.) Dr. Sirinian

discussed several options for treatment. *Id.* On July 23, 2007, Ms. Ponce went to Dr. Sirinian for a follow-up concerning her back pain, and again four days later on July 27, 2007 for elevated blood pressure. (R. 412-13.) Due to Ms. Ponce's hypertension, on August 9, 2007, she had a myoview myocardial perfusion study. (R. 410.) The exam revealed that she did not have ischemia because there was no significant reversible changes present to suggest ischemis, and no significant left ventiricular dilatation occurred with stress to suggest left main or triple vessel disease. *Id.* On September 5, 2007, October 8, 2007, and October 28, 2007, Ms. Ponce had follow-up visits with Dr. Sirinian. (R. 406-09.) She continued to complain of back pain and right side weakness. *Id.*

On October 11, 2007, Ms. Ponce had another brain MRI performed by Dr. Brenee Sirinian. (R. 435.) Dr. Sirinian noted that the MRI showed Ms. Ponce had a mild degree of small punctate white matter foci of the centrum ovale, and the appearance was suggestive of chronic small vessel arteriosclerosis or migraine. *Id.* Dr. Sirinian also indicated that there was no conspicuous acute ischemic insult or space occupying lesion. *Id.*

On January 7, 2008, neurosurgeon Dr. Sheldon Lazar performed another MRI on Ms. Ponce's cervical spine due to her right-side neck pain that extended to her right arm. (R. 473.)

The MRI revealed suspicious bone marrow with signal intensity for subtle patchy osteoporotic change and right foraminal stenosis. (R. 472.) It also revealed end plate irregularity and small osteophytosis, as well as C5-C6 minimal retrolisthesis, disk degeneration, and substantial right central disc extrusion compressing the spinal cord. (R. 472-73.) Dr. Lazar recommended that Ms. Ponce have a level one anterior cervical disc/osteophyte removal and fusion at C5-C6 in order to decompress her spinal canal. (R. 479.) On February 7, 2008, Dr. Lazar performed the surgery. (R. 482.)

On February 26, 2008, post surgery, Dr. Lazar reported to Dr. Sirinian that Ms. Ponce felt that her right leg was functioning better. (R. 480.) Dr. Lazar also reported that Ms. Ponce was having bilateral arm pain after the surgery, but that it was resolving and that a neurological examination revealed Ms. Ponce had right-sided weakness, which she had prior to surgery. *Id*. On April 14, 2008, Ms. Ponce went to the emergency room complaining of chest pain. (R. 560.) Her test results came back clear, and it was noted that she had no clubbing, cyanosis or edema. (R. 561.) She was evaluated for a few hours and then discharged. *Id*. On June 17, 2008, Ms. Ponce followed up with Dr. Lazar. (R. 463.) She reported that she had minimal pain in her right upper extremity and that it was not comparable to the pain she experienced after surgery. *Id*.

Dr. Lazar noted that Ms. Ponce's right leg was still a problem and was weaker than her left, however, the numbness that she had in both hands was better. *Id.* On August 8, 2008, Ms. Ponce had a stress echocardiogram revealing that she had negative stress echo for ischemia. (R. 553.)

On March 25, 2009, Dr. Lazar again evaluated Ms. Ponce. (R. 462.) She complained of pain on the left side of her neck and lancinating pains in her left upper extremity. *Id.* Dr. Lazar ordered an MRI, which he performed on April 1, 2009 and April 20, 2009. The April 1, 2009 MRI revealed a mild degree of the chronic white matter ischemia from small vessel arteriosclerosis. (R. 462, 460.) The April 20, 2009 MRI revealed a mild degenerative disc disease, disc bulging, and a small central disc protrusion at L5/S1. (R. 456.) Dr. Lazar noted that the bulging disc does not cause significant central canal or foraminal stenosis, but may gently impress upon the S1 nerve roots within the lateral recesses. (R. 456-57.) Dr. Lazar indicated to Dr. Remesz that Ms. Ponce did not have a surgical problem. (R. 455.) He indicated that she should lose weight, perform back exercises, and attend Pilates on a regular basis. *Id.* Ms. Ponce continued to have back pain issues. She had epidural steroid injections in her back on December 29, 2009, January 26, 2010, February 9, 2010, and June 10, 2010. (R. 488-99.)

On February 23, 2010, Ms. Ponce saw anesthesiologist Dr. Xiaoyuan Xie. (R. 502.) She complained of continuing back pain. *Id.* Dr. Xie directed that Ms. Ponce increase her medication intake of Gabapentin for a few weeks to see if the pain would subside before he would give her an epidural steroid injection. *Id.* On September 21, 2010, Ms. Ponce went to the emergency room complaining of severe neck and right arm pain. (R. 554.) Ms. Ponce's tests and blood work came back normal. (R. 559.) She was monitored for a few hours, prescribed medication and discharged with instructions to return if pain worsened and to follow up with her primary care physician. (R. 554.) On October 6, 2010, Dr. Lazar performed cervical disk surgery on Ms. Ponce's C6-C7 vertebrae. (R. 543-44.) After the surgery, on October 26, 2010, Ms. Ponce was evaluated by Dr. Lazar. (R. 542.) Dr. Lazar indicated to Dr. Younan that Ms. Ponce reported significantly less pain in her right upper extremity and less numbness in her hand, although she still had numbness of her thumb and first two fingers. *Id.* Ms. Ponce still had pain in her shoulder when moving it, and Dr. Lazar prescribed physical therapy three times a week for eight weeks. *Id.*

On February 9, 2011, Ms. Ponce returned to see Dr. Lazar and had an MRI. (R. 533.) The MRI revealed that there was "mild change of a small punctate nonspecific white matter

abnormal foci in cerebral hemispheres." *Id.* The MRI also revealed small vessel arteriosclerosis with possibly severe migraine etc. *Id.* However, there was no significant interval change and no evidence of a recent ischemic insult or intracranial hemorrhage. *Id.* Dr. Lazar indicated to Dr. Younan that Ms. Ponce once again did not have a surgical problem. (R. 535.) However, because of Ms. Ponce's continued complaints of pain, he would order a CT scan of Ms. Ponce's cervical spine to check the fusion, as well as an MRI of her brain. *Id.* The CT scan revealed mild cervical spondylosis with disc degeneration. (R. 538.) The CT scan also revealed bony fusion across the disc space at the C5-C6, and substantial retrolisthesis of C5 on C6, that produced mild spinal stenosis. (R. 539.) On April 28, 2011, Ms. Ponce saw Dr. Remesz. (R. 567). She complained of right arm tingling and numbness that had been persistent since her last cervical fusion in 2010. (R. 567.) She was prescribed pain medication and was told to follow-up with Dr. Lazar. *Id.* On May 20, 2011, Ms. Ponce had an x-ray performed by Dr. Ellyn Feinzimer. (R. 537.) The x-ray revealed postoperative changes at C6-C7. *Id*.

On June 9, 2011, Ms. Ponce continued to complain of back pain. (R. 663.) Dr. Daniel Laich ordered a CT scan of the lumbosacral spine and myelogram. *Id*. The CT scan showed mild lumbosacral spondylosis, minimal retrolistheiss of L4 and L5

with bulging disc, and poorly opacified right nerve root. (R. 663.) Also, mild central canal and bilateral foraminal stenosis was not ruled out. *Id.* A few weeks later on June 27, 2011, due to Ms. Ponce's complaints of having numbness and pain in her fingers, hands, right arm and lower extremities, Dr. Myron Glassenberg performed an EMG. (R. 622.) The EMG revealed that there was electrical evidence for a chronic right C5, C6 radiculopathy. *Id.* Four days after Ms. Ponce saw Dr. Laich for her follow-up exam. (R. 764.) Dr. Laich noted that Ms. Ponce still had right upper extremity pain radiating to her fingers, right lower extremity radiculopathy to top of foot, lumbar degenerative disc disease L5-S1, L4-L5 greater than L3-L4. (R. 766-67.) Dr. Laich also noted that Ms. Ponce indicated that she was still falling and losing control in her hand, and that it had worsened after her 2010 surgery. *Id.* Because of Ms. Ponce's continuous complaints of pain, on September 26, 2011, Dr. Laich performed a third cervical spine surgery on the posterior C3-T2. (R. 784-86.) Two days later on September 28, 2011 Dr. Laich completed a follow-up and counseled Ms. Ponce on her diet. (R. 789.)

**STATE CONSULTING PHYSICIANS**

On February 6, 2007, internal medicine physician Dr. Liana Palacci, D.O. completed a Consultative Examination Report. (R.

388-391.) Dr. Palacci noted that Ms. Ponce's cervical spine range of motion was normal. *Id*. Ms. Ponce's range of motion of the shoulder, elbows, wrists, knees, ankles, hips, and lumbar spine range was normal and she had grip strength of 5/5 bilaterally. *Id*. She was able to squat down, stand heel-and-toe, bear weight, and her gait was non-antalgic. *Id*. Dr. Palacci noted that Ms. Ponce did not need an assistive device to ambulate. *Id*. Dr. Palacci further noted that the Cerebellar and Romberg test were both negative. *Id*. Ms. Ponce revealed decreased sensation in light touch and pinprick of the right hand; she had strength of 5/5 in all extremities. *Id*. However, Ms. Ponce did have positive Phalen and Tinel sign of the right hand at the median nerve. *Id*. Dr. Palacci's impression was that Ms. Ponce had poorly controlled hypertension, probable carpal tunnel syndrome affecting the right hand, and that Ms. Ponce's complaints of lower back pain had no objective findings. (R. 391.)

On February 26, 2007, Dr. Henry Bernet completed a Physical Residual Functional Capacity Assessment. (R. 392-99.) Dr. Bernet concluded that Ms. Ponce had the ability to occasionally lift twenty pounds, frequently lift ten pounds, stand, sit, and/or walk with normal breaks for about six hours of an eight-hour workday, and had an unlimited ability to push and/or pull. (R. 393.) She could climb ladders, ropes, and scaffolds

21

occasionally, and could balance, stoop, kneel, crouch, and crawl frequently. (R. 394.) She had an unlimited handling ability (gross manipulation) and an unlimited ability to reach in all directions, including overhead. (R. 395.) However, because of her carpal tunnel syndrome in her right wrist she had limited fingering (fine manipulation) and feeling (skin receptors). *Id*. Dr. Berne also concluded that Ms. Ponce had limited far and near acuity, and unlimited depth perception, accommodation, color vision, and field of vision. *Id*.

After reviewing the objective medical evidence on February 28, 2007, Dr. Frank Jiminez for the Illinois Request for Medical Advice, advised that Ms. Ponce's claim be denied. (R. 400.) Ms. Ponce's claim was denied for failure to cooperate or insufficient evidence. *Id*. On August 13, 2007, upon reconsideration, Dr. Ernst affirmed Dr. Jiminez's finding and advised that Ms. Ponce's claim should be denied. (R. 403-404.)

**ALJ's DECISION**

On November 14, 2011 ALJ Nagle issued a partially favorable decision. (R. 34, 50.) He determined that Ms. Ponce was disabled on September 17, 2009, but not prior. (R. 49-50.) The ALJ based his decision on Ms. Ponce's age category changing. (R. 49.) Ms. Ponce turned fifty-five and because of her age, education, and work experience a finding of disabled was

reached.  *Id.*  The ALJ applied the five-step sequential analysis as required by the Act, under 20 C.F.R. 416(g).

The ALJ found that, prior to Ms. Ponce's established onset date, considering Ms. Ponce's age, education, work experience, and residual function capacity, Ms. Ponce was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy." *Id.*

At step one, the ALJ determined that Ms. Ponce had not engaged in substantial gainful activity since her alleged onset date. (R. 40.) At step two, the ALJ determined that Ms. Ponce had severe impairments of carpal tunnel syndrome of the right hand/wrist, back pain, and obesity. *Id.* The ALJ determined that those impairments caused more than minimal limitations to Ms. Ponce's ability to perform basic work activities. *Id.* The ALJ also determined that Ms. Ponce had hypertension and high cholesterol, however, he found that those conditions were not severe impairments because they did not result in more than minimal limitations to the Ms. Ponce's ability to perform basic work activities. *Id.*

At step three, the ALJ determined that "Ms. Ponce's impairments did not meet Listing 1.04 'Disorders of the spine,' because no evidence of motor loss existed; no evidence of arachnoiditis existed, and Ms. Ponce could still ambulate effectively as defined in 1.00(B)(2)(b)." (R. 41).

Furthermore, the ALJ determined that Ms. Ponce "did not meet Listing 11.14, 'Peripheral neuropathies,' because no evidence existed of disorganization of motor function as described in Section 11.04B in spite of prescribed treatment." *Id*.

At step four, the ALJ determined that Ms. Ponce "has the residual functional capacity to perform light work… except that she: can only occasionally balance, stoop, crouch, or climb ramps or stairs; can never kneel, crawl, or climb ladders, ropes, or scaffolds; can only occasionally perform fingering or feeling with the right hand; and is limited to occupations that can be performed with less than frequent near acuity and far acuity."

The ALJ supported this determination by considering all of Ms. Ponce's symptoms, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p, as well as opinion evidence in accordance with the requirements of 20CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (R. 41.) The ALJ noted that Ms. Ponce is alleging "disability due to severe back pain, bladder problems, a burst appendix, hypertension, high cholesterol, and pain and numbness over the right side of her body. She claimed limited use of her hands for grasping or holding objects and claimed diminished strength." *Id*. The ALJ

then explained that, after careful consideration of the evidence he found that, while Ms. Ponce's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he found that her claims concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment. (R. 42.)

The ALJ noted that, with regard to Ms. Ponce's numbness, weakness, right side pain and back pain, he found her allegations not fully credible and her testimony was exaggerated. (R. 42.) The ALJ noted that from a musculoskeletal standpoint and a neurological standpoint, "the claimant was not so limited that she could not work in accordance with the functional capacity report." *Id.* With regard to Ms. Ponce's numbness and weakness, the ALJ noted that Ms. Ponce gave several inconsistent dates when her symptoms began. (R. 42-43.) In particular, the ALJ outlines that in 2002, Ms. Ponce stated she had right side numbness and weakness for a couple of years, in January of 2003, she described having the same symptoms for four or five years, and in July of 2003 she described having the same symptoms for seven years. *Id.*

With regard, to her severe back pain, joint pain, and carpal tunnel limitations the ALJ found that Ms. Ponce was not credible. (R. 43-46.) Specifically, the ALJ found that "the

record shows numerous examinations in which the claimant's range of motion, weight bearing and gait, and muscle strength were adequate to allow her to perform work activity. *Id*. The ALJ relied heavily on state agency non-reviewing physicans, Dr. Bernet and Dr. Bones. (R. 47.) Specifically, the ALJ agreed with their diagnosis of carpal tunnel and stated that there had been no evidence presented that contradicted the physicians' review of Ms. Ponce. *Id*.

The ALJ also noted the State agency consultative examination of Dr. Linda Palacci. Dr. Palacci found that Ms. Ponce's spinal range of motion was normal in all segments and all of her joints exhibited normal range of motion. (R. 45.) The ALJ also relied on Dr. Palacci's finding that Ms. Ponce's grip strength was normal in all segments, all of her joints exhibited normal range of motion, and that she had full strength in all extremities. *Id*. With regard to Ms. Ponce's burst appendix, the ALJ determined that the event was very remote in time and nothing in the record suggested that Ms. Ponce's appendicitis resulted in any residual complications or problems. (R. 46.) With regard to Ms. Ponce's alleged hypertension and high cholesterol, the ALJ determined that the record did not support a finding of disability based singly or in combination with other symptoms. *Id*. With regard to Ms. Ponce's weight, the ALJ determined that she was mildly obese, and that her

obesity had not been shown to hamper her ability to perform basic work activities. (R. 47.) Therefore, the ALJ determined that Ms. Ponce was not disabled within the meaning of the Social Security Act and was not entitled to benefits prior to September 17, 2009. *Id*. at 50.

At step five, the ALJ determined that "prior to September 17, 2009, the date the claimant's age category changed, considering the claimants age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (R. 48.) The ALJ relied on the testimony of the Vocational Expert, and determined that, given Ms. Ponce's age, education, work experience, and residual functional capacity, there were jobs that existed prior to her onset date of September 17, 2009. *Id*. The VE listed the following positions: information clerk, DOT 237.367-018, which had four thousand eight hundred jobs in the local economy; usher, DOT 344.677-014, which had one thousand jobs in the local economy; hostess, DOT 352.667-010, which had seven thousand two hundred jobs in the local economy. (R. 49.) The ALJ concluded that "prior to September 17, 2009, a finding of 'not disabled' is therefore appropriate…" *Id*.

After the Appeals Council denied review, Ms. Ponce filed a lawsuit in this Court, seeking review of the Social Security

Administrations' final agency decision regarding her onset date. The parties consented to proceed before this Court, and the case was reassigned on October 2, 2012. The case is now before the Court on motions for summary judgment. Ms. Ponce asks the Court to reverse the Commissioner's decision of her onset date, or to remand the matter for further proceedings. Defendant responds, requesting that the Court grant summary judgment in its favor.

## STANDARD OF DISABILITY ADJUDICATION

An individual claiming a need for DBI or SSI must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the

Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007) (*citing Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir.2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so

as to prevent meaningful review, the Court must remand. *Id.*

**DISCUSSION**

Ms. Ponce argues that the ALJ's decision should be reversed or remanded, because the ALJ erred in three main ways. First, Ms. Ponce argues that the ALJ erred by failing to properly analyze her ability to stand and walk. Pl. Mot. S.J. at. pp. 7-11. Second, Ms. Ponce asserts that the ALJ erred in evaluating her credibility. *Id.* at 11-14. Third, Ms. Ponce argues that the ALJ erred in assessing her RFC to perform light work. *Id.* at 14. Specifically, Ms. Ponce argues that the ALJ did not include a discussion about her fatigue or neck limitations in the opinion. *Id.* at 14-15.

**THE ALJ'S REVIEW OF RIGHT LOWER EXTREMITY LIMITATIONS**

Ms. Ponce argues that the ALJ erred by failing to properly analyze her ability to stand and walk, and argues that, in doing so, the ALJ did not properly assess her limitations in working. Pl. Mot. S.J. at pp. 7-11. In particular, Ms. Ponce argues that the ALJ failed to correlate the medical evidence provided, which showed that she had significant right lower extremity limitations, to his conclusion that Ms. Ponce could perform jobs that required her to stand or walk the entire workday. *Id.* at 10. Ms. Ponce argues that she consistently reported that she had numbness in her lower extremities, especially on her right side, which restricted her activities in standing, walking, and

maintaining her balance. *Id*. Ms. Ponce also argues that, prior to her date last insured, she had right calf atrophy, a slight right limp, decreased sensation and other objective medical findings that the ALJ failed to properly assess. *Id*. Furthermore, she argues that the opinions of the state agency non-examining reviewing physicians, Dr. Bernet and Dr. Bone, do not mitigate the ALJ's failure to assess her limitations because nearly four hundred pages of additional medical evidence was placed into the record after their reviews. *Id*.

In response, the Commissioner argues that the ALJ did not err in assessing Ms. Ponce's activities in standing, walking, and maintaining her balance. Def. Resp. at p. 3. The Commissioner argues that the ALJ was thorough in his assessment and that Ms. Ponce's argument is "nothing more than a disagreement with how the ALJ weighed the evidence." *Id*. In particular, the commissioner argues that the ALJ took into account all of the evidence in the record and details over five pages of Ms. Ponce's medical history beginning in June 2002. *Id*.

The commissioner also argues that the ALJ not only detailed Ms. Ponce's medical history from 2002 but that he also discussed the findings of Dr. Lina Palacci, a consultative medical examiner who found Ms. Ponce to have "normal range of motion in her spine and joints and full leg strength." *Id*. at 6. The

Commissioner further argues that the ALJ gave great weight to the opinions of state agency reviewing physicians Dr. Bernet and Dr. Bone that opined that Ms. Ponce could "perform light work with additional limitations that she could frequently balance, stoop, kneel, crouch, crawl, or climb stairs or ramps … perform limited fingering and feeling with her right hand…" and only diagnosed Ms. Ponce with carpal tunnel. *Id*. at. 7.

Furthermore, the Commissioner argues that the ALJ did not err by failing to discuss Ms. Ponce's fatigue and neck limitations, and argues that an ALJ is not required to discuss every symptom or complaint in the record. *Id*. at 8. The Commissioner then argues that the neck and fatigue issues were minimal and arose in December of 2007, well after Ms. Ponce's date last insured, and argues that Ms. Ponce even denied significant neck pain in 2008. *Id*. at 9. Furthermore, the Commissioner argues that Ms. Ponce has not identified any contradictory opinion evidence in the new 400 pages of medical records that "might reasonably impact the reviewing physicians' 2007 opinions regarding Plaintiff's limitations prior to her date last insured" and that her "vague statement that '400 pages of medical records came in after those opinions' is not enough … to demonstrate that the ALJ abused his discretion." *Id*.

The ALJ is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge"

between the evidence and his conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (*citing Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000)). The ALJ stated that he carefully considered the entire record. (R. 41.) With regard to the ALJ assessing Ms. Ponce's lower extremities, fatigue, and neck limitations, the ALJ determined that Ms. Ponce could perform light work with occasional limitations such as balancing, stooping, crouching, or climbing ramps or stairs. *Id*. The ALJ determined that Ms. Ponce could never kneel, crawl, or climb ladders, ropes or scaffolds and could only occasionally perform fingering or feeling with the right hand. *Id*. The ALJ reviewed the objective medical evidence, as well as the subjective complaints of Ms. Ponce. *Id*. at 41. The ALJ detailed Ms. Ponce's symptoms, complaints, and the objective medical evidence beginning in 2002. *Id*. at 42. He assessed all of Ms. Ponce's complaints including, right lower extremity, back, burst appendix and obesity. *Id*. at 42-47. Out of all of the objective evidence presented, the ALJ noted that he gave great weight to the opinion evidence of state agency consultants Dr. Bernet and Dr. Bone, and that Ms. Ponce could perform light work in 2007. *Id*. at 47. The ALJ stated that the myriad of objective findings supported their conclusion that Ms. Ponce could perform light work and that no treating source opinion exists contradicting them. *Id*.

The Court finds that the ALJ was very thorough in mentioning and assessing the objective medical evidence from 2002 through 2010. Although Ms. Ponce might not agree with the conclusion reached, there is no indication that the ALJ failed to properly build a logical bridge to his conclusion that Ms. Ponce was not disabled prior to September 17, 2009. Furthermore, even with the 400 pages of medical evidence being submitted after the reviews of Dr. Bernet and Dr. Bones, the ALJ found that this medical evidence still did not contradict their findings that Ms. Ponce could perform light work. Therefore, the ALJ did not err in assessing Ms. Ponce's lower extremity limitations. The ALJ did not specifically address Ms. Ponce's fatigue or neck pain prior to her last date insured and how it would have affected her ability to perform light work. However, the ALJ is not required to address every piece of evidence in the record. *McFadden v. Astrue*, 465 F. App'x 557, 559 (7th Cir. 2012).

**THE ALJ'S CREDIBILITY DETERMINATION**

Next, Ms. Ponce asserts that the ALJ erred in evaluating her credibility in four ways. First, Ms. Ponce argues that the ALJ's credibility analysis largely consists of boilerplate language "are not credible to the extent they are inconsistent with the residual functional capacity assessment," and that such language is frowned upon by the Seventh Circuit. Pl. Mot. S.J.

34

at p. 11. Second, Ms. Ponce argues that the ALJ erred by disregarding her subjective complaints of disabling pain. *Id.* Ms. Ponce argues that this was legal error and factually erroneous because the medical record supported her reports of "right upper extremity limitations including: diminished strength and sensation; positive Phalen's and Tine's signs; and significant diagnostic evidence of stenosis, degeneration, cord compression, and cervical radiculopathy. *Id.* at 12. Third, Ms. Ponce argues that the ALJ erred by basing his credibility assessment on his personal observation of Ms. Ponce during the ALJ hearing. *Id.* Specifically, she argues that she never claimed to be in constant pain and that she was not preforming the activities that exacerbated her pain during the hearing, such as walking or standing. *Id.* at 12-13. Ms. Ponce argues that, because the ALJ based his credibility determination on her appearance at the hearing, he failed to consider many other factors such as her surgeries, treatments, and her work history that showed she was continuously employed for thirty years before her alleged onset date. *Id.* at 13. Fourth, Ms. Ponce argues that the ALJ erred by not considering her prior consistent testimony that she gave in front of the previous ALJ, and that he failed to assess her pain and daily activities.

The Commissioner argues that the ALJ's credibility finding was not patently wrong, and that the ALJ assessed Ms. Ponce's

credibility in great detail. Def. Resp. pp. 10, 12. The Commissioner further argues that, although the Seventh Circuit criticizes boilerplate language, it has not "held that the mere appearance of such language is grounds for reversal, rather, it is the use of the statement without any other explanation." *Id* at 11. Next, the Commissioner argues that the ALJ did properly assess Ms. Ponce and did not disregard her subjective complaints. *Id*. at 12. Specifically, the ALJ assessed Ms. Ponce's credibility based on her contradictory statements regarding the year her symptoms commenced, noting three different years: 2000, 1998, and 1996. *Id*. at 12-13.

Next, the Commissioner argues that the ALJ not only considered his personal observations and the medical record in determining Ms. Ponce's credibility, but also Ms. Ponce's subjective complaints. *Id*. at 12. Specifically the Commissioner argues that the ALJ noted Ms. Ponce's complaints of February 2008, October 2002, and Ms. Ponce's testimony describing the pain from 2005-2010. *Id*. Next, the Commissioner argues that ALJ did not have to specifically address the surgeries regarding Ms. Ponce undergoing aggressive treatment because the first of the surgeries took place in February 2008, eight years after Ms. Ponce's alleged onset date, rendering them useless to evaluating Ms. Ponce's credibility regarding the eight years preceding the surgery. *Id*. at 14.

The ALJ did indeed used boilerplate language discounting the intensity, persistence and limiting effects of Ms. Ponce's alleged symptoms. (R. 42.) However, in the immediate following paragraph, as well as throughout the rest of the opinion, the ALJ expanded his finding with further detail about the severity of Ms. Ponce's alleged symptoms, medical records, and treatments.(R. 42-47.) The ALJ noted that Ms. Ponce's subjective complaints regarding her burst appendix, which occurred in 1995, being the cause of her residual complications and problems, was baseless due to it being remote in time and not indicated in the medical record. *Id*. at 46. The ALJ only mentioned Ms. Ponce's first back surgery in detail, and did not mention the other two surgeries in formulating his opinion regarding her credibility, nor did he mention Ms. Ponce's prior testimony in her previous ALJ hearing. *Id*. at 45. However, he mentioned that, even as recent as September of 2010, Ms. Ponce indicated that she had very minimal back pain, which indicates she could have performed light work during that time. *Id*. at 46. Also, the ALJ partially evaluated Ms. Ponce's credibility based on her describing debilitating pain at the hearing without exhibiting any overt pain. *Id*. at 42.

Even with the ALJ using boiler plate language in his analysis, and partially using the ALJ hearing as a basis for his credibility determination, the ALJ still provided substantial

and detailed evidence in determining Ms Ponce's credibility. The ALJ provided over five pages of analysis of objective medical records, in assessing why Ms. Ponce would be able to perform light work and why her statements regarding her alleged symptoms were not credible as to preclude her from working altogether. Even if the Court were to find that all of Ms. Ponce's complaints regarding her credibility assessment had some validity, it still would not be enough to surmount the substantial amount of evidence that led to the ALJ's decision. The Court finds that the determination that Ms. Ponce lacked credibility and that her symptoms did not preclude her from performing light work prior to September 17, 2009 to be reasonable and well supported by the evidence.

**THE ALJ'S RFC DETERMINATION**

Next, Ms. Ponce argues that the ALJ failed to analyze her functional capacity and that he did not follow Social Security Administration policy. Pl. Mot. S.J. at p. 14. When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) *(citing* 20 C.F.R. § 404.1523; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir.2009)). A failure to fully consider the impact of non-severe impairments requires

reversal. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir.2003).

Ms. Ponce argues that the ALJ did not "include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." Pl. Mot. S.J. at p. 15. Ms. Ponce argues that the ALJ noted, yet did not properly assess, her fatigue. *Id*. Specifically, her difficulty sleeping at night and her need for extra sleep during the day. *Id*. She also argues that the ALJ failed to consider her neck pain and limitations and that such failure amounts to reversible error because the vocational expert testified that no jobs would be available if she could only occasionally rotate, extend, or flex her neck. *Id*.

The Commissioner argues that Ms. Ponce's argument regarding the ALJ failing to assess limitations based on her fatigue and neck are baseless. Def. Resp. p. 8. The Commissioner argues that "SSR 96-8p does not require that an ALJ discuss his assessment of every symptom or complaint in the record." *Id*. Furthermore, the Commissioner argues that Ms. Ponce's complaints about her neck and fatigue were minimal and that she only complained once of fatigue prior to her date last insured. *Id*. at 9. The Commissioner argues that the first mentioning in the record of neck pain occurred in 2010, and that "absent

contemporaneous records supporting a conclusion that prior to September 2005, Plaintiff had disabling limitations related to fatigue and neck pain, the ALJ did not err by excluding fatigue and neck pain from his discussion and RFC determination."

During the hearing, the ALJ asked the VE a hypothetical regarding job availability for a person who had functional limitations with the ability to occasionally rotate, extend or flex their neck. (R. 93.) The VE responded that there would be no jobs available for such a person. *Id.* In his opinion, the ALJ did note that Ms. Ponce denied evening fatigue in July of 2003, but the following year in June of 2004, she complained of excessive fatigue. (R. 43.) Furthermore, he also noted that Ms. Ponce denied having significant neck pain in January of 2008. (R. 45.)

Although the ALJ did not expound in great detail regarding Ms. Ponce's functional capacity as it related to fatigue or neck pain, he did, however, mention it in his credibility determination. (R. 43, 45.) As argued by the Commissioner, Ms. Ponce only complained of fatigue once before her date last insured. *Id.* Furthermore, while Ms. Ponce argues that the ALJ failed to properly assess her work limitations due to neck pain, she denied having significant neck pain in 2008. (R. 466.) These symptoms were remote and contradictory. Therefore, the Court finds that the ALJ was reasonable in not expounding on

such symptoms in great detail, as complaining of fatigue only once before her date last insured and denying significant neck pain three years after the date, shows that these limitations had little to no impact on Ms. Ponce's functional capacity and ability to perform light work.

The Court finds that (1) there is substantial evidence to support that the ALJ adequately assessed Ms. Ponce's lower extremity limitations (2) that the ALJ provided substantial and detailed analysis to support his credibility determination and (3) the ALJ was reasonable in his RFC assessment of Ms. Ponce. Therefore, the Court finds that the ALJ's decision is supported by substantial evidence and should be affirmed.

Conclusion

For the reasons set forth above, the Court denies Ms. Ponce's Motion for Summary Judgment and grants the Commissioner's Motion for Summary Judgment, affirming the decision.


Date: May 22, 2014

                    E N T E R E D:


                    UNITED STATES DISTRICT COURT